**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 2 9 2020

AMARPREET DHALIWAL,

                           Plaintiff,

        -against-

GEORGE AVETISOV; HYPR CORP.,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                               <u>MEMORANDUM DECISION</u>
                                               <u>AND ORDER</u>

                                                  17 Civ. 7959 (GBD)

GEORGE B. DANIELS, United States District Judge:

      From January 13, 2020 through January 17, 2020, this Court held a bench trial in this action brought by Plaintiff Amarpreet Dhaliwal against Nominal Defendant HYPR Corp. ("HYPR") and Defendant George Avetisov ("Avetisov"), the CEO of HYPR. (*See* Compl., ECF No. 1; *see also* Trial Tr., ECF Nos. 93, 95, 97, 99, 101.) Plaintiff asserts claims for breach of contract and unjust enrichment, seeking both monetary and declaratory judgments. (*See id.* ¶¶ 30–44.) Specifically, Plaintiff asserts that after entering into an agreement to be "50/50 partners" in the creation of the corporation HYPR and the product "Hypercard," Defendants have failed to provide Plaintiff with his share of the profits, or acknowledge Plaintiff a co-owner of HYPR. (*Id.* ¶¶ 1, 5–7.) Defendants subsequently asserted a counterclaim against Plaintiff for rescission based on fraudulent inducement. (*See* Def. George Avetisov and Nominal Def. HYPR Corp.'s First Am. Answer to Pl.'s Compl. and Countercl. ("Am. Answer and Countercl."), ECF No. 61, ¶¶ 19–26.)

      This Memorandum Decision and Order constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. This Court finds in favor of Defendants on Plaintiff's breach of contract claim, and in favor of Plaintiff on Defendants' fraudulent inducement counterclaim. Both the complaint and the counterclaim are therefore DISMISSED.

# I.  PROCEDURAL HISTORY

Plaintiff commenced this action on October 16, 2017 against Defendants. (*See generally* Compl.)  Defendants filed an answer and counterclaim on March 13, 2018, (*see* Def. George Avetisov and Nominal Def. HYPR Corp.'s Answer to Pl.'s Compl., ECF No. 28), and subsequently filed an amended answer on April 15, 2019, (*see* Am. Answer and Countercl.). Plaintiff filed his answer to Defendants' counterclaim on May 6, 2019.  (*See* Answer to Countercls., ECF No. 65.)

This Court held a five-day bench trial from January 13, 2020 through January 17, 2020 to rule on Plaintiff's claims and Defendants' counterclaim.[1]  During trial, Plaintiff called two witnesses—himself and Bruce F. Webster—in his case-in-chief.  Plaintiff proffered Webster as an expert witness.  (*See* Trial Tr. at 301:4–348:5; *see also* Decl. of Jonathan Bach in Supp. of Defs.' Mot. to Exclude the Test. Of Pl.'s Expert Witness, Ex. B (Expert Report of Bruce F. Webster ("Webster Report")), ECF No. 80-2.)[2]  Defendants called in opposition and in their case-in-chief three witnesses—Avetisov, as well as Bojan Simic and Roman Kadinsky, both of whom worked with Avetisov.

---

[1] Prior to the trial, Plaintiff raised a potential issue regarding production and redactions of a "Summary Capitalization Table." (*See* Pl.'s Dec. 30, 2019 Letter Mot., ECF No. 85.)  At the pretrial conference held on January 7, 2020, the parties agreed to certain terms for the redaction and production of this document prior to trial. (*See* Tr. of Pretrial Conf. dated Jan. 7, 2020 ("Pretrial Conf. Tr."), ECF No. 104 at 2:14–18:6.)  Plaintiff's motion for discovery, therefore, has been resolved.

[2] Plaintiff offers the testimony of Bruce F. Webster to support its argument that HYPR "is the same or substantially similar to the project covered by the Hypercard Start-Up Agreement dated April 30, 2014." (*See* Webster Report at 1.) Prior to trial, Defendants moved to exclude the testimony of Plaintiff's expert witness. (*See* Defs.' Notice of Motion to Exclude the Test. Of Pl.'s Expert Witness, ECF No. 79.)  Defendants argued, *inter alia*, that Webster "br[ought] no genuine expertise and applie[d] no recognized methodology to any aspect of this case." (Defs.' Mem. of Law in Supp. of Their Mot. to Exclude the Test. Of Pl.'s Expert Witness, ECF No. 81 at 1.)  This Court initially reserved reaching a decision and stated at the January 7, 2014 pretrial conference that it would hear Webster's testimony at trial and make a determination afterward. (*See* Pretrial Conf. Tr. at 18:7–16.)  Ultimately, Webster's testimony does not affect the outcome of this case either way—even considering his opinion, it is clear that Plaintiff breached the agreement and is not entitled to damages.  There is therefore no reason to strike Webster's testimony, as it does not affect the determination.  Defendants' motion to exclude the testimony is DENIED.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(a) provides, in relevant part, that a court conducting a bench trial "must find the facts specially and state its conclusions of law separately," and that "[j]udgment must be entered under Rule 58." Fed. R. Civ. P. 52(a)(1). Rule 52(a) further provides that such "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6).

## III.   FINDINGS OF FACT

### A.  Hypercard Technology

The initial concept for the Hypercard technology was to create a "cold, decentralized authentication" card which would utilize blockchains and biometric measures, or, put more simply, a plastic card that would "allow[] for secure authentication of a user identity for a variety of services." (Compl. ¶ 21; Pl.'s Ex. 34 (HYPRKEY Description).) As described by the parties, "Blockchain is the technology that is synonymous with the rise of cryptocurrency . . . [which] mov[es] bits of data from the link of the chain to another." (Trial Tr. at 19:5–7.) At trial, Avetisov presented evidence that he had documented various case studies showing how Hypercard would function in different settings. (See Defs.' Ex. 198 (XMind Case Studies).)

### B.  The Parties' Initial Meeting and the Origin of the Concept for Hypercard.

On or about April 25, 2014, Plaintiff and Avetisov met for the first time at the Bitcoin Center in New York City. (Trial Tr. at 447:13–14, 447:20–22.) Plaintiff alleges that at the time, Avetisov was showing what he called a "BitsCard," i.e., a plastic card with a key code—similar to a prepaid gift card—that could transfer Bitcoins. (Id. at 28:1–19; Pl.'s Ex. 5 (Photographs of BitsCard).) Plaintiff alleges that he raised some concerns about the BitsCard technology with Avetisov. (Trial Tr. at 29:13–21.) The two then discussed the possibility of teaming up to create new technology.

3

(*Id.* at 448:12–16, 511:17–22; Defs.' Ex. 45 (Text Messages Between Pl. and Avetisov ("Text Message Thread")) at HYPR000009543.)

Both Plaintiff and Avetisov claim that they independently came up with the initial idea for Hypercard, and presented it to the other. (*See* Trial Tr. at 28:24–29:11, Compl. ¶¶ 1–2; *see also* Trial Tr. at 463:23–24, 466:13-22;; Defs.' Ex. 198 (XMind Case Studies); Defs.' Ex. 193 (XMind Documents); Defs.' Ex. 118 (BitsCard Description).) Plaintiff conceded at trial, however, that "there's not another person on earth" who would be able to corroborate his assertion that this was his idea. (Trial Tr. at 112:24–113:2.) He also could not provide any evidence at trial that would support his assertion that this was his idea. (*See, e.g.*, *id.* at 110:23–112:23.) Additionally, while the Complaint originally asserted that Plaintiff came up with both the idea and the name "Hypercard," Plaintiff later agreed at trial that Avetisov came up with the name. (*Id.* at 34:20–35:3.)

Avetisov asserts that it was his idea for both the technology and the name. At trial, he provided evidence that he reached out to a friend in March—prior to ever meeting Plaintiff—and asked his friend to be involved in the creation of this technology. (*Id.* at 467:2–468:6; Defs.' Ex. 48 (Avetisov Text Message Records) at HYPR000012019.) Avetisov testified and provided evidence to demonstrate that he—and not Plaintiff—had this idea in the works on his own. (Trial Tr. at 463:23–24, 466:13-22; Defs.' Ex. 198 (XMind Case Studies); Defs.' Ex. 118 (BitsCard Description).) For example, Avetisov produced documentation demonstrating that prior to meeting Plaintiff, he had contemplated how best to ensure that one could securely provide certain identification through Hypercard. (*See* Defs.' Ex. 198 (XMind Case Studies); Defs.' Ex. 118 (BitsCard Description); Defs.' Ex. 193 (XMind Documents).)

Avetisov testified as to his background in technology and engineering, as well as his experience in building startups and developing ideas relating to cryptocurrency. (*See* Trial Tr. at

4

449:10–451:1, 455:23–456:2–3.) Avetisov explained that despite this being his idea, he needed someone to assist with the business and finance aspect of marketing the product, while he created the software. (*Id.* at 448:12–16, 511:17–22; Text Message Thread at HYPR000009543.) According to Avetisov, Plaintiff represented that he was well-versed in business and finance, which is what caused Avetisov to ask Plaintiff to partner with him. (Trial Tr. at 448:19–23, 470:23–471:7.)

Plaintiff asserts that Avetisov's evidence demonstrates that the idea Avetisov apparently had prior to their meeting was very different from the concept they worked on to create Hypercard. (*Id.* at 808:22–25.) Indeed, Plaintiff alleges that Avetisov did not initially plan to create a hardware device; he had planned to create plastic cards that would contain a private key printed on the back. (*Id.* at 811:9–812:3.) This, Plaintiff asserts, is different from his idea—that is, the idea to which Avetisov allegedly agreed—which was for a "cold" card, *i.e.*, a card without direct access to the internet, containing a private key within it. (*Id.*)

## C. Subsequent Meetings and the April 30 Agreement.

Plaintiff and Avetisov met again on April 27, 2014. (*Id.* at 139:14–16, 471:12–15.) At this meeting, the two discussed creating a card that would rely on blockchain-based technology. (*Id.* at 471:16–19, 473:17–19, 508:14–509:4.) Avetisov alleges that Plaintiff initially suggested creating a "pitch deck" to present to potential investors. (*Id.* at 471:22–25.) According to Avetisov, Plaintiff showed him a pitch deck that he claimed to have created, and Plaintiff stated that he could make a similar one for Hypercard. (*Id.* at 472:1–11, 475:6–8, 475:12–20.) Shortly thereafter, Avetisov sent Plaintiff a white paper describing the proposed technology, which Avetisov understood Plaintiff would use to create the pitch deck. (Pl.'s Ex. 4 (Apr. 29, 2014 Email from Pl. to Santana) at DHAL356.) According to Avetisov, this white paper memorialized the ideas that he had prior to

meeting Plaintiff. (Trial Tr. at 482:1–4.) According to Plaintiff, this meeting was the first time that the two referenced creating this type of "device." (*Id.* at 812:24–813:5.)

At this point in their discussions, Avetisov suggested to Plaintiff that the two enter into a written agreement to ensure that neither of them would "pull a Zuckerberg." (Pl.'s Ex. 4 (Apr. 29, 2014 Email from Pl. to Santana) at DHAL356.) Avetisov testified at trial that when he said he wanted to avoid "pull[ing] a Zuckerberg," he meant that he wanted to avoid the possibility of either party "taking an idea, pitching it to a [venture capital firm], raising capital with it, and leaving," or put differently, Avetisov wanted to avoid the possibility of either party excluding the other. (Trial Tr. at 621:17–18.) Plaintiff agreed that his understanding was that neither party should take the idea for himself or exclude the other by depriving him of his economic benefits. (*Id.* at 48:1–7.) Avetisov suggested in an April 29, 2014 email that he and Plaintiff each own 50% of the Hypercard project through Brillx Corporation ("Brillx"). (Pl.'s Ex. 4 (Apr. 29, 2014 Email from Pl. to G. Santana) at DHAL356.) Brillx was a company that Avetisov owned prior to meeting Plaintiff.

The parties met again on April 30, 2014. Prior to entering into a formal agreement, Avetisov alleges, he asked to see Plaintiff's resume so that he could feel comfortable that Plaintiff would be able to handle the business-side of the arrangement. (Trial Tr. at 499:7–10.) According to Avetisov, Plaintiff showed him his resume, and Avetisov followed up with questions regarding Plaintiff's employment history. (*Id.* at 500:6–501:1.) Plaintiff provided certain information about his prior employment at Morgan Stanley and the Chicago Trading Company, including that "he did very well" in both positions. (*Id.* at 500:8–10.) Plaintiff initially alleged that he never showed Avetisov his resume. (*Id.* at 158:4–5.) Avetisov, however, submitted metadata demonstrating that Plaintiff had downloaded his resume while the two were together. (*See id.* at 152:13–153:20; Defs.' Ex. 312 (Resume Metadata); Defs.' Ex. 313 (Analysis of Resume Metadata); Defs.' Ex. 315 (Delphia Deck

6

Metadata); Defs.' Ex. 316 (Delphia Deck Metadata).)   After reviewing this evidence, Plaintiff

testified that he could not recall why he downloaded his resume, he might have been trying to send

it to someone.  (Trial Tr. at 160:17–21.)

According to Avetisov, during this meeting, the parties wrote down what tasks they would

each need to complete to move forward.  (Defs.' Ex. 110 (Photo of White Board from Apr. 30, 2014

Meeting); Trial Tr. at 491:19–21.)  For example, Avetisov would focus on developing the technology

and Plaintiff would handle the business and finances.  (Defs.' Ex. 110 (Photo of White Board from

Apr. 30, 2014 Meeting); Trial Tr. at 492:3–495:4.)  Avetisov alleges that on April 30, 2014, the two

documented their responsibilities more specifically, agreeing that Avetisov would create

"technology abstract[s]" and Plaintiff was to create a "focused exec[utive] summary business

proposal."  (Defs.' Ex. 112 (Photo of White Board from Apr. 30, 2014 Meeting); Trial Tr. at 533:16–

534:8.)

The parties entered into a written agreement on April 30, 2014.  (*See* Pl.'s Ex. 9 (Hypercard

Start-Up Agreement ("April 30 Agreement")).)  According to Avetisov, both parties considered this

to be "a placeholder agreement."  (Trial Tr. at 502:2.)  The agreement provided:

> This agreement is entered into by George Avetisov and Amarpreet ("Peter")
> Dhaliwal on April 30, 2014. We, the afore-mentioned parties agree to be 50/50
> partners in a company that develops a platform for the storage and transfer of digital
> assets including, but not limited to cryptographic hashes and any other blockchain
> based data. Brillx Corp. is the current legal entity that will own and fund the
> aforementioned project, tentatively named Hypercard, which is a 'cold' card that will
> allow consumers to transfer digital assets seamlessly and securely. George Avetisov
> is to legally transfer 50% ownership of Brillx Corp…to Amarpreet Dhaliwal for the
> payment of $1 USD. Brillx Corp. will be the entity that starts development of this
> project, but this agreement will also hold in the event Brillx Corp. is reincorporated
> or merges as the result of any capital injection. Any platform and software built on
> top of this project is to be considered the result and product of a combined effort on
> behalf of both George Avetisov and Amarpreet Dhaliwal.

(April 30 Agreement.)

Plaintiff alleges that the April 30 Agreement is unambiguous. According to Avetisov, however, the parties knew that this was not the full scope of their agreement, which is why the agreement does not include an integration clause or any further specifics as to each individual's obligations. (*Id.*; *see also* Trial Tr. at 502:7–14.) The parties assert different opinions as to what they were each required to do under the terms of the April 30 Agreement. Specifically, Avetisov states that he believed that the parties would share responsibilities of the business and split the company's proceeds and expenses. Despite the language of the April 30 Agreement stating that the parties were entering into a "50/50 partner[ship]," Plaintiff testified that there was "nothing [he] was required to do" under the terms of the contract, and pursuant to the agreement, he was permitted to "simply sit on [his] hands." (*See* Trial Tr. at 163:19–23.) Plaintiff agreed with Avetisov, however, that the parties were to split the expenses and profits. (*See id.* at 169:14–19, 196:22–197:2, 198:2–7.)

## D. Plaintiff's Failure to Comply with His Obligations.

After signing the April 30 Agreement, the parties continued to meet with each other and others to discuss the product. According to Avetisov, Plaintiff initially stated that he had access to "a network of investors and [venture capitalists] that he knew" and "had raised capital from . . . before." (*Id.* at 474:21–24.) Avetisov now believes, however, that Plaintiff has never successfully raised money for any project.

Avetisov testified that he worked constantly on the project, including by delivering another white paper to Plaintiff, setting up various meetings with industry advisors, and taking significant monetary risks to develop the relevant technology. (*See id.* at 591:20–592:8.) Avetisov asserts that Plaintiff did not participate in this work, nor did he take part in any of the work he promised to do. (*Id.* at 592:9–593:12, 190:14–191:18; Text Message Thread at HYPR000009526-9532,

8

HYPR000009535, HYPR000009537.) For example, Avetisov asserts that Plaintiff did not send an NDA to Avetisov, despite his promising to do so, nor did he make good on his promise to provide Avetisov with a recommendation for a prototyping company. (Trial Tr. at 561:16–562:7, 241:5–14.)

Additionally, according to Avetisov, Plaintiff never began working on the pitch deck. Indeed, at trial, when asked about his work on the pitch deck, Plaintiff stated that he found that line of questioning to be "so weird" because according to him, the parties "never even discussed" creating a pitch deck. (*Id.* at 192:9–23.) Avetisov, however, proffered evidence demonstrating that Plaintiff knew he was responsible for working on the pitch deck. (*See* Text Message Thread at HYPR000009541; Defs.' Ex. 110 (Photo of White Board from Apr. 30, 2014 Meeting).) Avetisov also submitted metadata to demonstrate that the pitch deck Plaintiff initially showed him—which Plaintiff originally alleged was his own work product—was created not by Plaintiff, but by Morgan Stanley. (*See* Defs.' Ex. 317 (Pitch Deck Metadata).) During his deposition, Plaintiff asserted that this deck was wholly unrelated to Morgan Stanley. (*See* Tr. of Amarpreet Dhaliwal Dep. dated Sept. 13, 2018 at 162:5–11.) At trial, however, he articulated that he created this document for fun during his off-hours while working at Morgan Stanley, and that all the information contained within the deck was fictitious. (Trial Tr. at 104:20–105:12.)

Avetisov also testified that Plaintiff did not pay for certain expenses, despite his responsibility for half of the costs. For example, Avetisov alleges that Plaintiff never paid 50% of the attorney's fees, or for Avetisov's work, despite Avetisov's reminders. (*See, e.g.*, *id.* at 514:20–22, 516:2–16; Defs.' Ex. 20 (May 5–6, 2014 Emails Between Pl. and Avetisov).) At trial, Plaintiff initially testified that he planned to pay the attorney but never received an invoice. (Trial Tr. at 228:10–15.) Later, however, Plaintiff testified that he never intended to pay the attorney because it

9

was not clear that they would actually move forward with retaining an attorney. (*Id.* at 197:21–198:1, 194:22–195:2.) Similarly, Plaintiff testified that he did not pay Avetisov for his work because he did not receive a bill. (*Id.* at 198:8–9.) Subsequently during the trial, however, Plaintiff testified that he did not pay Avetisov because was waiting for Avetisov to deliver "some slides or some skins." (*Id.* at 215:12–19.) As Plaintiff testified at trial, he understood "Slides" to be in reference to Avetisov's cousin Dave, who was allegedly working on "skins," *i.e.*, wireframes for Hypercard. (*Id.* at 215:25–216:12.)

Additionally, Avetisov testified that on May 7, 2014, he provided Plaintiff with paperwork to take over 50% of Brillx pursuant to the April 30 Agreement. (*Id.* at 529:8–14; *see* Defs.' Ex. 32 (Brillx Shareholder Meeting Minutes) at HYPR000000018; Defs.' Ex. 21 (May 6, 2014 Email from Avetisov to Pl.).) Plaintiff never signed the document, despite Avetisov's multiple reminders. (Trial Tr. at 544:13–21; *see also* Text Message Thread at HYPR000009547.) When questioned as to why he never signed this documentation, Plaintiff testified that "it might have slipped our minds." (*See* Trial Tr. at 211:17–212:4.) Later, however, Plaintiff testified that he asked Avetisov for the incorporation documents, but "never had the opportunity" to sign them. (*See id.* at 228:16–21.)

### E. Plaintiff's Non-Responsiveness.

Avetisov states that by May 9, 2014, Plaintiff was nearly completely unresponsive to Avetisov's various attempts at conversation. Avetisov began to send various emails and text messages, inquiring as to why Plaintiff was not responding. (*See, e.g.*, Text Message Thread at HYPR000009549, HYPR000009546; Trial Tr. at 538:3–17.) Plaintiff conceded at trial that he stopped communicating with Avetisov via email after May 8, 2014. (*See* Trial Tr. at 208:20–209:4.) Approximately one week later, Avetisov emailed his accountant to pause the incorporation process. (*See id.* at 555:12–556:7; Defs.' Ex. 33 (May 14, 2014 Email from Avetisov to Protax NYC).) While

10

Plaintiff provided phone records to support his assertion that he had spoken with Avetisov only two days prior, (*see* Trial Tr. at 676:17–677:6; Pl.'s Ex. 22 (G. Avetisov's Sprint Phone Bill) at HYPR11948), the phone records do not reveal whether there was any actual communication or discussions between the parties. Moreover, Plaintiff did not testify as to what the parties discussed during this conversation, if it even occurred.

After his continued attempts to contact Plaintiff with no response, Avetisov emailed Plaintiff stating that since he had not heard back, he assumed that Plaintiff was abandoning the project. (Text Message Thread at HYPR000009546; *see also* Trial Tr. at 553:15–22.) Plaintiff and Avetisov communicated briefly after that, but soon thereafter, Plaintiff became unresponsive once again. (Trial Tr. at 228:1–4, 559:7–560:5; *see* Text Message Thread at HYPR000009536, HYPR000009544-9545, HYPR000009525, HYPR000009525, HYPR000009525.) When asked why he did not respond, Plaintiff testified that it might have been because he received the texts during a weekend. (Trial Tr. at 219:7–9.) When it was pointed out that Avetisov sent these texts during the week, however, Plaintiff testified that he did not respond because he might have been running errands, "[l]ike laundry or mailing stuff." (*Id.* at 222:11–223:17.)

After not receiving a response, Avetisov reached out to his friend Roman Kadinsky, and the two agreed to be 50/50 partners. (*Id.* at 570:12–571:25; Defs.' Ex. 48 (Avetisov Text Message Records) at HYPR000012019.) On May 25, 2014, Plaintiff called Avetisov on the phone, but Avetisov did not answer. (Pl.'s Ex. 22 (G. Avetisov's Sprint Phone Bill) at HYPR11969.) While Plaintiff alleges that he left several messages for Avetisov and was waiting for Avetisov to respond, (Trial Tr. at 83:3–84:6), Avetisov testified that Plaintiff did not leave a message, and that Avetisov did not even realize that he had missed a call. (*Id.* at 568:10–19.) Plaintiff alleges that at this point, he was still under the impression that he was protected under the April 30 Agreement and that even

11

if Avetisov went ahead with the project, Plaintiff would receive half of any proceeds. (*Id.* at 86:9–14.) According to Avetisov, even after HYPR was incorporated in June 2014, Plaintiff never reached out, and continued to contribute nothing to the business. (*Id.* at 568:20–569:10, 245:2–5.) Indeed, after their final conversation in May 2014, Defendant did not see or hear from Plaintiff until his filing of this litigation approximately three years later. (*See id.* at 183:22–185:7; *see also id.* at 17:6–9.)[3]

**F. Changes to the Hypercard.**

In January 2015, HYPR presented a prototype of Hypercard. (*Id.* at 732:2–733:1.) According to Avetisov, the product failed for a variety of reasons, including that there was minimal interest from consumers. (*Id.* at 575:25–577:8, 733:5–734:4.) Avetisov alleges that this caused HYPR to "abandon Hypercard" and drastically change its business model. (*Id.* at 577:21–23.) For example, Avetisov asserts that HYPR: (1) changed Hypercard from a hardwire card to a software; (2) eliminated the idea of using cold storage, and instead connected Hypercard to the internet; (3) changed the target market from consumers to businesses and enterprises such that "[y]ou cannot [use] HYPR as a consumer"; and (4) eliminated the relationship to blockchain or cryptocurrency. (*Id.* at 577:13–584:18, 742:12–16.) At trial, Kadinsky testified that after incorporating HYPR, he and Avetisov continued working on the project, but eventually narrowed its use because of time constraints for upcoming shows to investors. (*Id.* at 779:5–780–1.)

Plaintiff asserts that Hypercard is—at its core—the same original technology, and that any new ideas were built upon his initial idea. For example, Plaintiff alleges that the new technology and the original: (1) are both made by the company HYPR; (2) are both universal keys that can be used for essentially all purposes; (3) both do not require use of a password; and (4) are available to

---

[3] As Defendants' attorney stated at trial, "We don't hear anything from Mr. Dhaliwal, no communication with Mr. Avetisov until three years later, when his lawyer sends a demand letter saying that he was entitled to 50 percent." (*See id.* at 17:6–9.)

individual consumers. (*Id.* at 702:3–708:8, 753:2–758:11, 790:3–795:19.) Additionally, at trial, Plaintiff presented a video of Defendants' final product, which showed a "blue hardware device" on the back of a phone. (Pl.'s Ex. 128 (Youtube Video "The Trigger CES: Bojan Simic, HyprKey" (Jan. 9, 2015) at https://youtu.be/9OE3UruZkdM).) Plaintiff alleged that this was precisely what he and Avetisov had been planning to produce together. (Trial Tr. at 814:23–815:21.)

## IV.    CONCLUSIONS OF LAW

### 1.  Plaintiff Cannot Bring a Claim Against HYPR.

Plaintiff brings his claims against both Defendants HYPR and Avetisov. HYPR, however, must be dismissed as a named defendant. A plaintiff cannot bring a claim for breach of contract against an individual or entity who was not a party to the contract, unless that party has assumed or been assigned rights under the contract. *See, e.g.*, *Kamdem-Ouaffo v. Pepsico, Inc.*, No. 14 Civ. 227 (KMK), 2015 WL 1011816, at *7 (S.D.N.Y. Mar. 9, 2015). When Plaintiff and Avetisov discussed the possibility of working together and when the two entered into the relevant agreement, HYPR did not exist as a company. Similarly, Plaintiff cannot bring a claim for unjust enrichment against HYPR, as Plaintiff has not alleged, nor is there any suggestion that Plaintiff performed work for HYPR—a necessary requirement to bring such a claim. *See, e.g.*, *Scanlon v. Devon Sys., Inc.*, No. 89 Civ. 1634 (LMM), 2000 WL 218389, at *5 (S.D.N.Y. Feb. 24, 2000); *Kagan v. K-Tel Entm't, Inc.*, 568 N.Y.S.2d 756, 757 (1st Dep't 1991).

Plaintiff brings HYPR into this litigation as a "nominal defendant" and does not bring any claim against HYPR. Plaintiff asserts that HYPR is a necessary party to this litigation because he seeks as damages stock in HYPR. The fact, however, that HYPR might be affected by a judgment in favor of Plaintiff does not make it a necessary party. *See MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 387 (2d Cir. 2006) (stating that it is not enough, to be a necessary party under Rule 19(a), "for a third party to be adversely affected by the outcome of the litigation").

Moreover, and as explained below, because Plaintiff cannot prove that he is entitled to *any* damages on its breach of contract claim, HYPR is not a proper defendant to this lawsuit.

### 2. Plaintiff's Breach of Contract Claim Fails.

Under New York law, "the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21–22 (2d Cir. 2011). As described below, Plaintiff failed to act pursuant to his obligations under the parties' agreement (comprised of the parties' understanding of their responsibilities, and not simply the terms of the April 30 Agreement). Moreover, Plaintiff cannot rely upon the April 30 Agreement as the entirety of the agreement because it is not supported by consideration. Indeed, by the time Avetisov chose not to pay Plaintiff or transfer shares of HYPR to Plaintiff, he was already excused from performance. Plaintiff is therefore not entitled to a judgment granting either specific performance or monetary damages.

### i. The Parties Entered into a Valid and Enforceable Contract, Under Which Both Parties Were Obligated to Perform.[4]

Plaintiff and Avetisov dispute what should be considered the entire agreement between the parties—Plaintiff asserts that this Court should look only to the signed April 30 Agreement, and Avetisov alleges that this agreement is ambiguous. There is no question, however, that there was a valid and enforceable agreement between the parties. This Court cannot simply assume that because the parties signed the April 30 Agreement, that defines the bounds of the parties' understanding of their obligations and duties. The terms of contract are instead bound by the parties' understanding

---

[4] Because this Court finds the parties entered into a valid, enforceable agreement, Plaintiff's claim for unjust enrichment is dismissed. "New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (citing *Clark–Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 516 N.E.2d 190 (1987); *Ellis v. Abbey & Ellis*, 742 N.Y.S.2d 225, 228 (1st Dep't 2002); *Mariacher Contracting Co., Inc. v. Kirst Constr., Inc.*, 590 N.Y.S.2d 613, 615 (4th Dep't 1992)).

14

of their agreement—*i.e.*, where the parties had a meeting of the minds. Indeed, "There must be 'an objective meeting of the minds sufficient to give rise to a binding and enforceable contract.'" *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) (quoting *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109 (1981)). Regardless of which interpretation of the contract is adopted, it is clear that Plaintiff failed to act or fulfill any of his obligations under the terms of the agreement. It is Plaintiff and not Avetisov, therefore, who breached the agreement.

Indeed, even if this Court accepted Plaintiff's assertion and assumed that the April 30 Agreement is the controlling contract between the parties, the precise terms of the agreement required Plaintiff and Avetisov to act jointly. Specifically, it states that "the . . . parties agree to be 50/50 partners in [the] company" and "[a]ny platform and software built on top of this project is to be considered the result and product of a combined effort of [the parties]." (*See* April 30 Agreement.) Therefore, it can be assumed that all the obligations would be shared between the two. Moreover, while Plaintiff asserts that the April 30 Agreement is unambiguous, the contract does not state that either of the parties are entitled to payment without any combined effort. It defies logic to assume the parties would not have included explicit language identifying the absence of Plaintiff's obligations under the agreement. Not only is this assertion counterintuitive, Plaintiff also provides no evidence to support his claim that the agreement required no active participation from him. In fact, much of Plaintiff's testimony supports the opposite conclusion. For example, Plaintiff acknowledged at trial that he was obligated under the April 30 Agreement to share the cost of any expenses incurred in the development of Hypercard. (*See, e.g.*, Trial Tr. at 169:14–20.)

It is clear from the evidence that the understanding of the parties was not fully encompassed in the terms of the April 30 Agreement. Not only is there no integration clause, but the evidence

proffered at trial, as well as testimony regarding the parties' understanding prior to signing the April 30 Agreement support the conclusion that the parties were both aware that they were each respectively obligated to act pursuant to an agreement comprised of a greater set of terms and obligations. (*See* Pl.'s Ex. 4 (Apr. 29, 2014 Email from Pl. to Santana); Defs.' Ex. 12 (XMind and BlockWeb Biometric Thesis Tech Overview); Defs.' Ex. 20 (May 5–6, 2014 Emails Between Pl. and Avetisov)); Text Message Thread at HYPR000009544, HYPR000009536, HYPR000009525, HYPR000009541, HYPR000009547; Defs.' Ex. 110 (Photo of White Board from Apr. 30, 2014 Meeting); *see also* Trial Tr. at 483:4–12.)

## ii. Plaintiff Failed to Perform Under the Contract.

This Court need not reach a determination as to whether Avetisov breached the contract by failing to pay Plaintiff because Plaintiff did not perform, thereby excusing Avetisov from performance. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.").

First, Plaintiff did not deliver on any of his responsibilities under the contract. The record demonstrates that Plaintiff had certain obligations pursuant to the agreement, including creating a pitch deck, providing an NDA, and more. Plaintiff acknowledges that he did not work on any of these tasks, as he relies on the argument that he was not obligated to act. Indeed, Plaintiff does not, and seemingly cannot, point to a *single piece* of work product that he created or even helped to create. Additionally, even separate from his obligation to create certain work product, Plaintiff also acknowledged at trial that he did not pay certain expenses for which he conceded he was responsible. Moreover, there is a dispute as to whether Plaintiff ever tendered the $1 pursuant to the April 30 Agreement. (*See* Trial Tr. at 55:25–56:7; 545:10–13.)

16

Plaintiff also failed to correspond with Avetisov and essentially abandoned the agreement. Avetisov gave him multiple opportunities to participate in the agreement, including by giving him notice that if he did not receive a response, he would move forward without Plaintiff. At trial, Plaintiff could not provide any reasonable explanation as to why he ignored nearly all of Avetisov's text messages and emails. It is completely unreasonable for Plaintiff to assert that he not only carried no responsibilities under the agreement, but also that he was not obligated to respond to Avetisov, and still be entitled to collect benefits from the contract.

For these reasons, Plaintiff's argument that Avetisov breached the agreement, including by not transferring the shares of Brillx to Plaintiff, fails. At the point in time that Avetisov told his accountant to pause the transfer of shares to Plaintiff, Avetisov had already reached out to Plaintiff several times without receiving any response. It was therefore reasonable for Avetisov to hesitate moving forward with the transfer until he received clarity on Plaintiff's commitment to the agreement. Plaintiff's apparent expectation that he could ignore Avetisov and essentially not participate in the agreement, yet still receive all the benefits Avetisov initially offered, is utterly unreasonable and unsupported by evidence. Plaintiff provided no substantive involvement or contribution. He abandoned all efforts toward participation.

### iii.   There Was No Consideration for the Written Agreement.

As described above, the record supports a finding that the contract was comprised of more than simply the terms of the April 30 Agreement. Even if this were not the case, however, Plaintiff would be unable to rely upon the April 30 Agreement as comprising the entire agreement between the parties because he is unable to demonstrate that there was any consideration. "The law is well settled that in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration." *Startech, Inc. v. VSA Arts*, 126 F.Supp.2d 234, 236 (S.D.N.Y. 2000).

"Consideration is defined as either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor." *Id.* at 237.

Plaintiff alleges that because he shared his original idea for the Hypercard technology with Defendant, he did provide consideration for the contract. Plaintiff, however, also stated at trial that he had shared his idea with Avetisov separately from drafting and signing the April 30 Agreement. (Trial Tr. at 162:24–163:4.) Additionally, there is no evidence in the record supporting Plaintiff's claim that he first conceived of the idea for Hypercard, and Plaintiff acknowledged at trial that he had not provided any evidence to support this claim. Moreover, at trial, Plaintiff admitted that prior to meeting Avetisov, he had never had "[another] idea for any other technological product or device." (*Id.* at 113:19–115:3.)    Plaintiff even lacked the technological expertise or experience to independently create such a product.

The record and logic both support a finding that the technology behind Hypercard was initially Avetisov's idea. First, Avetisov has a background and education in technology. (*See id.* at 449:10–451:1,  455:23–456:2–3.)    Additionally, Avetisov produced documentation at trial evidencing that he had been workshopping this idea prior to even meeting Plaintiff and had also tried to recruit his friend in marketing the project. Even, however, if this *were* Plaintiff's idea, he concedes that he shared this idea with Avetisov prior to April 30, 2014, the date on which they entered into the written agreement. Pursuant to New York law, "[g]enerally, past consideration is no consideration and cannot support an agreement because the detriment did not induce the promise." *Samet v. Binson*, 996 N.Y.S.2d 149, 150 (2d Dep't 2014).

New York law recognizes an exception to this rule, though it does not apply to these circumstances. Indeed, New York law provides that:

> [a] promise in writing and signed by the promisor or by his agent shall not be denied
> effect as a valid contractual obligation on the ground that consideration for the

promise is past or executed, if the consideration is expressed in the writing and is proved to have been given or performed and would be a valid consideration but for the time when it was given or performed.

N.Y. Gen. Oblig. Law. § 5–1105. In order to demonstrate that a written contract falls under this exception, "the [written] recitation of consideration must not be vague or imprecise." *Genger v. Genger*, 76 F.Supp.3d 488, 498 (S.D.N.Y. 2015); *see also Umscheid v. Simnacher*, 482 N.Y.S.2d 295, 297–98 (2d Dep't 1984) (holding that "consideration was not 'expressed' within the meaning of section 5–1105" where it was "vague, imprecise, and, indeed, . . . without meaning"). Here, the written terms of the April 30 Agreement clearly do not identify any consideration provided by Plaintiff, nor does the April 30 Agreement state that Plaintiff was sharing his own personal idea with Avetisov.

Throughout this litigation, Plaintiff has alleged that in the alternative, even if this were not his idea initially, the fact that he agreed not to pursue the project on his own without Avetisov was his "consideration" in the project. That theory fails because there is absolutely no evidence in the record that demonstrates that (1) Plaintiff conceived of this idea such that he could move forward with this project without Avetisov's approval, or (2) Plaintiff ever tried to or even *could* move forward in creating Hypercard without Avetisov. Avetisov on the other hand, produced evidence demonstrating that contrary to Plaintiff's assertion, it was Avetisov's idea and he could have—and in fact did—move forward on the project without Plaintiff.

### 3. Defendants' Claim for Fraudulent Inducement Fails.

Defendants bring an affirmative claim for fraudulent inducement. Specifically, the parties dispute whether Plaintiff lied when Avetisov asked him certain information regarding his resume and professional background. Under New York law, "a plaintiff alleging [fraudulent inducement] must show by clear and convincing evidence that the defendant knowingly or recklessly

19

misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).

This Court need not analyze (1) whether Plaintiff's statements were false or (2) if they were, whether Plaintiff intentionally misrepresented these facts.  Indeed, Defendants are unable to demonstrate that the statements were material or that they suffered any damages as a result.  For example, Despite Defendants' assertions, there is no evidence that Avetisov would not have entered into the business arrangement had Plaintiff not made the statements about his prior career or expertise. Indeed, Defendants do not point to any contemporaneous documentation, nor do the terms of the April 30 Agreement indicate that this was a material part of the arrangement.  Moreover, Defendants do not and cannot allege that they suffered any damages as a result of any misrepresentations, even if materially misleading. Indeed, Avetisov continued to work on the project with his friend, incorporated HYPR, and this Court is not awarding any damages to Plaintiff on his breach of contract claim.  Defendants' claim for fraudulent inducement is therefore dismissed.

## V.   CONCLUSION

Judgment is entered in favor of Defendants dismissing Plaintiff's complaint and in favor of Plaintiff dismissing Defendants' counterclaim.

The Clerk of Court is hereby directed to close the motions at ECF No. 79 and ECF No. 80.

Dated: New York, New York
September 29, 2020

SO ORDERED.

GEORGE B. DANIELS
United States District Judge

20